**IN THE UNITED STATES BANKRUPTCY COURT FOR THE**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **Assist-Med, Inc.** | § | **CASE NO. 16-31624-H5-11** |
| | § | **(CHAPTER 11)** |
| | § | |
| **DEBTOR** | § | |

**BRIEF REGARDING**
**EVEREST BUSINESS FUNDING CLAIM**
**(Claim No. 7)**

Debtor is not liable to Everest Business Funding because the law demonstrates that the financing arrangements at issue are usurious loans. Everest contracted for interest (disguised as a purchase of future receivables) for much more than any reasonable statutory rate.

Debtor is a service provider which receives its funds to aid its Medicaid clients through DADS (The Texas Department of Aging and Disability Services). Everest's loan documents purport to purchase Debtor's future receivables. Debtor took out two loans from Everest – one in which the Debtor received $197,370.00 on September 2, 2015, and one in which it received $78,343.55 on December 23, 2015. Daily payments on these loans increased to $2,307.70 after the second loan. The amount Everest charged the Debtor for the first loan was $292,000.00 plus fees for the "purchased amount", and $300,000 plus fees for the "purchased amount" on the second loan. Debtor paid a total to Everest of $241,999.90 on the two loans. At best, the Debtor believes that the balance owed Everest is $33,693.65 plus $7,640.00 in fees for a total of $41,333.65. Plan treatment for Everest is to pay 5% interest to Everest as a secured creditor, although based on the UCC-1 on file with the State of Texas, it should be treated as an unsecured creditor with no interest.

Everest is in the business of providing working capital loans to businesses at astronomical effective interest rates. Although Everest labels its predatory lending transactions as purchases of "future receivables," no actual receivables are identified in the Agreements. Instead, Everest demands repayment from "receivables" that have yet to come into existence.  The title of the loan documents is "Payment Rights Purchase and Sale Agreement."

Everest allegedly secured these loans by a UCC-1 filings that placed liens on all of Debtor's assets, including all of its tangible and intangible personal property.  However, the UCC-1 is defective inasmuch as it was filed on September 17, 2015, and the Organization's name is Corporation Service Company, As Representative, with no mention of Everest Business Funding. The Agreements provided for Everest to receive a set percentage of Debtor's cash flow from *future receivables not yet in existence.*

The Agreements provided for an advance of money dubbed the "Purchase Price" – the price at which Everest purported to purchase future accounts receivable from Debtor.  In turn, Debtor was obligated to repay the "Purchased Amount," defined as the "dollar value of the Future Receivables."

 To illustrate, in the first agreement, Everest paid a Purchase Price of $200,000 (although the Debtor only received $197,370.00 as the amount advanced) in exchange for a repayment of $292,000 (the purported  "Purchased Amount"). Embedded within the Purchased Amount Everest included a "fee."  Debtor, however, calls this extra $92,000 what it is: interest. Put another way, the term "Purchase Price" constitutes the advance of principal by Everest to the Debtor, and "Purchased Amount" is the total amount of principal and imputed interest to be repaid by Debtor to Everest. Thus, through this self-help provision alone, Everest contracts for, charges,

And is receiving usurious interest. Despite their misleading labels, these Agreements are loans, and Debtor is required to pay Everest interest (if Everest properly filed a valid UCC-1). This interest, when calculated as a percentage of the so-called "advance" or "Purchased Amount," is usurious. Before the Debtor informed Everest it would no longer be held hostage by such predatory lending tactics, Debtor was paying an average effective interest rate over 100%.

Debtor respectfully requests that this Court reject the self-serving label that Everest used on its form agreements and find that the Agreements amount to illegal loans with usurious interest. Everest did not operate or manage the transactions as if they were account purchase transactions. Everest acted as a lender *(not a factor),* and its method of "advancing" cash mirrored the procedures used by typical lenders. In contrast to a lending relationship, under a factoring agreement (a/k/a, an account purchase transaction), the factor purchases a client's *billing invoices* at a discount in exchange for an interest in the receivables *owed* by third parties – customers — in payment of these invoices. "The factor pays a discounted amount for the invoices and *manages* the receivables and collections." "On payment, *the factor remits* a portion of the payment to the factoring client, retaining the remainder for service fees."

Here, like a lender would do, Everest took a security interest in all of Debtor's assets, including all of its tangible personal property and intangible property - not just in the "receivables" that might eventually be owed by third parties. Moreover, the so-called "future receivables" were not actually receivables at all. Rather, they were *Medicaid payments made by DADS to protect Debtor's clients.*

With having a lien from Debtor's *future receivables* to Debtor, nothing was "owed" to Debtor on those future receivables. Of course, Everest played no role in "managing" these future payments or in "remitting" a portion of the future payment to Debtor. If Everest had contacted DADS and demanded that the payments be re-routed to Everest instead to the Debtor for the protection of its clients, DADS would have laughed them off.

The Agreements contrast sharply with the typical factoring relationship where the factor purchases a client's *existing* invoices, *manages* the receivables, and *remits* payment to the factoring client. The Agreements themselves conclusively establish that Everest purchased no invoices from Debtor, managed none of Debtor's receivables, and remitted no portion of any such receivables to Debtor. Therefore, the Agreements are *not* account purchase transactions-no matter what label Everest unilaterally gave them-they are loans as a matter of law. Everest purportedly took a security interest in all of Debtor's assets-not just the "future receivables."

The Agreements show that Everest and Debtor intended for Everest to act as a secured lender to Debtor. In *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.,* 336 F.3d 410 (5th Cir. 2003)*,* the Fifth Circuit held that the so-called purchaser's filing of a UCC financing statement listing as collateral the merchant's "accounts, contract rights, instruments, documents, chattel paper" and other "general intangibles"- not just the accounts receivable purportedly tilted the scales in favor of finding the agreement to be a loan (and not a true sale).

Indeed, Everest took a security interest "in all of [Debtor's] assets. Then, Everest perfected the security interest by filing a comprehensive UCC-1 Financing Statement covering the same lengthy list of collateral- not just the future receivables purportedly sold (although Debtor challenges the legality of the UCC filing.) Just as in *Reaves,* Everest's comprehensive financing filing reveals the true essence of the arrangement between Everest and Debtor- a loan.

Everest considered only the Debtor's creditworthiness and ignored the creditworthiness of DADS.

A traditional factor would look to a third party's creditworthiness, rather than the seller of accounts receivable, to decide the likelihood of repayment. After all, the seller is not expected to pay on the accounts receivable; the customers are. But here, Debtor <u>was</u> obligated to repay Everest. In other words, Debtor was not just a seller, as it would be in an account purchase transaction; Assist-Med was a debtor, as it would be in a loan transaction. Debtor bore all of the risk of non-performance.

Unlike a factoring agreement where the creditor bears the risk of non-performance, the Debtor bore all of the risk by remaining liable to Everest in the event the Debtor breached the Agreements or faced an inability to pay. In *Endico Potatoes, Inc. v. CIT Grp.Factoring, Inc.,* 67 F.3d 1063 (2d. Cir. 1995) the Second Circuit analyzed who bore the risk of non-performance in deciding whether there was a sale of accounts receivable or a secured lending arrangement. The Court correctly noted, "[w]here the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.

Everest further insulated itself from risk by requiring the execution of a personal guaranty in connection with the Agreements in order to solidify Debtor's absolute obligation to repay the principal amounts loaned. The Agreements provide that, upon any breach by the Debtor, the guarantor becomes "fully liable to Everest for the entire Purchased Amount plus any liquidated

damages and permitted fees and costs under this Agreement less the amount received by Everest from the Daily Percentage."

In *Reaves,* a similar personal guaranty supported the Fifth Circuit's holding that the so-called factoring agreement was actually a loan, despite the presence of several terms and provisions characteristic of a sale of accounts. In finding the absence of a true sale, the court held that when the parties' agreement was read in its entirety, and considering both the personal guaranty and the UCC filings covering substantially all of the merchant's assets (not just the accounts receivable purportedly sold), it became clear that "the *risk* of non-payment or underpayment [was] borne entirely by [the merchant] and [had] not shifted to [the purchaser]." As in *Reaves,* the Agreements always provide Everest with recourse against the Debtor. And if Everest ever is without recourse against the Debtor, the risk shifts to the guarantor, not Everest. Nothing stands in Everest's way when it comes to being repaid the entire "Purchased Amount," which includes usurious interest.

Upon default or breach by the Debtor, Everest enjoyed a host of remedies typically associated with lenders, not factoring companies:

the entire outstanding Purchased Amount shall become immediately due and payable, i.e., a standard acceleration clause characteristic of a loan;

Everest could automatically debit from any of Debtor's bank accounts all or any portion of the outstanding Purchased Amount;

Because Everest (1) expected to receive the same Purchased Amount (which includes added money that amounts to usurious interest) regardless of whether the Debtor's business prospered or failed and (2) could lose no part of the money loaned unless both the Debtor and the guarantor were unable to pay and the secured collateral proved insufficient. The Debtor had an absolute obligation to repay the principal. Everest contracted for usurious interest.

As to the third element of usury, the evidence before the Court conclusively establishes that Everest contracted for usurious interest. "Interest" is defined as "compensation for the use, forbearance, or detention of money."

It is well-settled that any charge made for the use, forbearance, or detention of money is "interest" for usury purposes no matter the label placed upon it or the artfulness with which it is concealed. The absence of an express rate of interest in an agreement is not dispositive. Here, Everest tried to conceal its contracting for interest in excess of the usury ceiling by grouping the additional charge owed by the Debtor in with the total "Purchased Amount."

Respectfully submitted,

/s/ Margaret M. McClure

_____

MARGARET M. MCCLURE
State Bar No. 00787007
909 Fannin, Suite 3810
Houston, Texas 77010
(713) 659-1333
(713) 658-0334 (facsimile)
margaret@mmmcclurelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2017, I electronically served counsel for Everest Business Funding with this brief.

/s/ Margaret M. McClure

_____

MARGARET M. MCCLURE