

ENTERED
11/28/2017

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE | § |
| | § |
| | § |
| ASSIST-MED, INC., | §   CASE NO. 16-31624-H5-11 |
| | § |
| Debtor, | § |
| | § |

MEMORANDUM OPINION AND ORDER ON DEBTOR'S OBJECTION TO CLAIM NO. 7
OF EVEREST BUSINESS FUNDING, AND OBJECTION TO CLAIM NO. 8 OF ACCORD
BUSINESS FUNDING, LLC.

Before the Court are Debtor's Objection to Proof of Claim No. 7 of Everest Business

Funding Partners, LLC. (Docket No. 95), and Objection to Proof of Claim No. 8 of Accord

Business Funding, LLC. (Docket No. 96).

Debtor is a home healthcare agency that offers personal assistance services. Debtor's sole

source of income is Medicaid payments received from the Texas Department of Aging and

Disability Services to protect Debtor's clients. Debtor raises two objections to Claim Nos. 7 and

8: 1) the transactions are usurious loans disguised as sales of accounts receivable; and 2)

Debtor's receivables are Medicaid payments Debtor receives for patient care which cannot by

law be purchased. Debtor requests this Court disallow the claims. (Docket Nos. 95 and 96).[1]

---

[1]Debtor has not sought an affirmative recovery from either EBF or Accord.

P:\assistmed.20171127.wpd

Claimants assert they are factors in the business of purchasing accounts receivable. They contend their contracts with Debtor are factoring agreements which give them security in all Debtor's property, including all future receivables. Claimants assert that since their contracts are for factoring, their transactions with Debtor cannot be considered loans, usurious or not.

Florida law governs Debtor's contract with Everest Business Funding Partners, LLC ("EBF"), while Texas law governs its contract with Accord Business Funding, LLC ("Accord"). Florida and Texas treat both the characterization as a loan or a sale and the penalty for usurious loans differently. The Court allows both claims as filed. Both claims are wholly unsecured.

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157(A). This is a core proceeding under 28 U.S.C. § 157(b)(2).

I. EBF

A. The EBF Transactions

Debtor and EBF entered into three separate contracts.[2] The second contract dated August 28, 2015 purports to reflect EBF's purchase of $292,000 in Debtor's future accounts receivable for $200,000, with Debtor to repay the $292,000 in daily payments of $2,246.15. (Debtor's Exhibit 2).

EBF states that Debtor made 80 daily payments of $2,246.15, totaling $179,692.00, to EBF before the parties executed the third contract. EBF states that Debtor owed EBF $119,046.45 on the second contract as of December 23, 2015. EBF states that the parties agreed that $6,738.45 Debtor paid under the second contract would be applied to the third contract.

_____

[2]EBF states that Debtor paid the first contract dated August 2, 2013 in full. (Docket No. 110). The details of this transaction are not in evidence.

(Docket No. 110).

The third contract dated December 23, 2015 purports to reflect EBF's purchase of $300,000 in Debtor's future accounts receivable for $200,000, with Debtor to repay the $300,000 in daily payments of $2,307.70. (Debtor's Exhibit 1).

EBF applied the $200,000 Debtor was to receive on the third contract to the $119,046.45 it asserts remained owing from the second contract, plus $2,630.00 in fees, and paid the net proceeds of $78,323.55 to Debtor on or about December 23, 2015. Debtor made 34 daily payments of $2,307.70, totaling $78,461.80, to EBF before it filed the petition in this Chapter 11 case. (Docket No. 110).

B.  Terms of the Third EBF Contract

The third contract between Debtor and EBF requires Debtor to deposit all money received in the future into one bank account. It authorizes EBF to debit the "daily payment amount" (in the third contract, $2,307.70) from Debtor's bank account on each business day until Debtor has paid the "purchased amount" (in the third contract, $300,000) to EBF. The third contract states that the parties contemplated that the daily payment amount would equal 15 percent of the money Debtor received. (Debtor's Exhibit 1).

The third contract between Debtor and EBF identifies the following events of Debtor's default:

> (a) Seller interferes with EBF's right to collect the Daily Payment (and payment for arrears, if any) in violation of this Agreement; (b) Seller violates any term or covenant in this Agreement; (c) any representation or warranty by Seller in this Agreement proves to have been incorrect, false or misleading in any material respect when made; (d) the sending of notice of termination by Seller; (e) Seller transports, moves, interrupts, suspends, dissolves or terminates its business; (f) Seller transfers or sells all or substantially all of its assets; (g) Seller makes or sends notice of any intended bulk sale or

transfer by Seller; (h) Seller uses multiple depository accounts without the prior written consent of EBF (i) Seller changes its depositing account or Credit Card processor without the prior written consent of EBF; (j) Seller performs any act that reduces the value of any Collateral granted under this Agreement; or (k) Seller defaults under any of the terms, covenants and conditions of any other agreement with EBF.

(Debtor's Exhibit 1).

EBF's remedies on default under the third contract include its right to enforce a personal guaranty of Debtor's obligations by Debtor's president, Ruth Briggs, and its right to increase the daily payment amount to 100 percent of the money Debtor receives. (Debtor's Exhibit 1).

The third contract contains the following provisions which EBF contends save it from being a usurious loan:

> 2.2 Sale of Payment Rights:  Seller represents and warrants that it is selling the Purchased Amount of Future Receipts to EBF in Seller's normal course of business and the Purchase Price paid by EBF is good and valuable consideration for the sale.  Seller is selling a portion of a future revenue stream to EBF at a discount, not borrowing money from EBF. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by EBF.  If Future Receipts are remitted more slowly than EBF may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to EBF and would not be in breach of or in default under this Agreement.  EBF is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and EBF assumes these risks based on Seller's representations, warranties and covenants in this Agreement, which are designed to give EBF a reasonable and fair opportunity to receive the benefit of its bargain.  By this Agreement, Seller transfers to EBF full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein.

(Debtor's Exhibit 1, Docket No. 110).

Paragraph 4.5 of the third contract between Debtor and EBF applies Florida law to the contract. (Debtor's Exhibit 1).

C.  EBF's Proof of Claim

EBF filed a proof of claim, in the amount of $222,439.75.  The proof of claim asserts

security in all Debtor's accounts, future receipts, cash, and deposit accounts.  (Claim No. 7-1).

EBF calculates its claim by adding the $592,000 in purportedly purchased accounts

receivable ($292,000 under the second contract plus $300,000 under the third contract) plus

$7,640.00 in fees, less the $179,692 Debtor paid under the second contract, the $78,461 Debtor

paid under the third contract, and the $119,046.45 EBF applied to pay off the second contract.

(Docket No. 110).

D.  The Third EBF Contract is a Sale Under Florida Law

Florida law looks to the substance of the transaction rather than to the form to determine

usury.  The intent of the parties controls in determining whether there has been a sale, or a loan

subject to usury laws. *Indian Lake Estates, Inc. v. Special Investments, Inc.*, 154 So.2d 883 (Fla.

Dist. Ct. App. 1963), *citing  Griffin v. Kelly*, 92 So.2d 515 (Fla. 1957).  All of the negotiations,

circumstances and conduct of the parties surrounding and connected with their contracts may be

material in determining whether there was an intent to violate the usury law or to evade usury law

by disguising the transaction as a sale. *Indian Lake Estates, Inc. v. Special Investments, Inc.*, 154

So.2d 883 (Fla. Dist. Ct. App. 1963), *citing Milana v. Credit Discount Co.*, 163 P.2d 869 (Cal.

1945).

The third contract between Debtor and EBF unambiguously identifies the transaction as a

sale of accounts receivable and disclaims the possibility of construing the sale as a loan.  This

transaction was the third such transaction between Debtor and EBF, and no issue arose as to

usury until Debtor amended its objection to EBF's claim.  There is insufficient evidence to shift

the burden of proof as to the circumstances leading to the third contract.  The Court finds that the third contract is a sale of accounts receivable, rather than a loan.

## II.  Accord

### A.  The Accord Transaction

The contract between Debtor and Accord[3] dated December 23, 2015 purports to reflect Accord's purchase of $36,750 in Debtor's future accounts receivable for $25,000, with Debtor to repay the $36,750 in daily payments of $446.88.  Debtor made 28 daily payments of $446.88, totaling $12,512.64, to Accord before it filed the petition in this Chapter 11 case. (Accord Exhibit 3).

### B.  Terms of the Accord Contract

The contract between Debtor and Accord requires Debtor to deposit all money received in the future into one bank account.  It authorizes Accord to debit the "daily payment amount" of $446.88 from Debtor's bank account on each business day until Debtor has paid the "purchased amount" of $36,750 to Accord.  The contract states that the parties contemplated that the daily payment amount would equal 7 percent of the money Debtor received.  (Accord Exhibit 2).

The contract between Debtor and Accord identifies the following events of Debtor's default:

> (a) Seller fails to pay any amount owed to ABF as and when due; (b) Seller interferes with ABF's right to collect the Daily Payment (and payment for arrears, if any) in violation of this Agreement; (c) Seller violates any term or covenant in this Agreement; (d) Any representation or warranty by Seller in this Agreement proves to have been incorrect, false or misleading in any material respect when made; (e) Seller admits in

---

[3]Accord is identified in the contract as "ABF."

writing its inability to pay its debts, or make a general assignment for the benefit of creditors; or any proceeding is instituted by or against Seller seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (f) the sending of notice of termination by Seller; (g) Seller transports, moves, interrupts, suspends, dissolves or terminates its business; (h) Seller transfers or sells all or substantially all of its assets; (i) Seller makes or sends notice of any intended bulk sale or transfer by Seller; (j) Seller uses multiple depository accounts without the prior written consent of ABF (k) Seller changes its depositing account or Credit Card processor without the prior written consent of ABF; (l) Seller performs any act that reduces the value of any Collateral granted under this Agreement; or (m) Seller defaults under any of the terms, covenants and conditions of any other agreement with ABF.

(Accord Exhibit 2).

Accord's remedies on default under the contract include its right to enforce a guaranty by Briggs and its right to increase the daily payment amount to 100 percent of the money Debtor receives.

Accord asserts that the following provision of the contract conclusively establishes that the transaction is a sale rather than a usurious loan:

Seller hereby sells, assigns and transfers to ABF without recourse (except upon an Event of Default defined in Section 3 of the SELLER AGREEMENT TERMS AND CONDITIONS), upon payment of the Purchase Price, the Specified Percentage of the proceeds of each future sale by Seller (collectively "Future Receipts") until the Purchased Amount has been delivered to ABF by or on behalf of Seller.

(Accord Exhibit 2, Docket No. 121).

Paragraph 4.5 of the contract between Debtor and Accord applies Texas law to the contract. (Accord Exhibit 2).

C. Accord's Proof of Claim

Accord filed a proof of claim, in the amount of $30,737.36. The proof of claim asserts security in all Debtor's accounts, future receipts, cash, and deposit accounts. (Claim No. 8-1).

Accord's proof of claim does not itemize how its claim was calculated. Accord's response to Debtor's original claim objection reflects that the claim, in the amount of $30,737.36 includes a $5,000 "Default fee" and a $2,500 "block on account fee."[4]

### D. The Transaction Between Debtor and Accord is a Sale Under Texas Law

Prior to 1979, Texas law recognized the totality of circumstances test for determining whether a transaction is a sale or a loan. *See, e.g. Griffith v. Gadberry*, 182 S.W.2d 739 (Tex. Civ. App.--El Paso 1944).

In 1979, the Texas Legislature adopted Texas Finance Code § 306.103. That section provides in part: "For the purposes of this chapter, the parties' characterization of an account purchase transaction as a purchase is conclusive that the account purchase transaction is not a transaction for the use, forbearance, or detention of money." Tex. Fin. Code § 306.103(b).

Usury can arise only from a loan or forbearance of money. *Express Working Capital, LLC v. Starving Students, Inc.*, 28 F.Supp.3d 660 (N.D. Tex. 2014). Future receivables are "accounts" for the purpose of Section 306.103(b). *Id.*

---

[4]The Court notes that the remainder of the claimed amount $23,237.36, is exactly $1,000 less than the $36,750 in purportedly purchased accounts receivable less the $12,512.64 Debtor paid to Accord. The $1,000 difference appears to have entered Accord's accounting at the beginning of the transaction, where the amount stated is $35,750 rather than the $36,750 which appears on the face of the document. (Accord Exhibits 2, 3).

The contract between Debtor and Accord expressly provides that it is a sale of accounts. Under Section 306.103(b), it is a sale of accounts and not a loan.[5]  Thus, Accord is not liable for usury under Texas law.  The allowed amount of Accord's claim is $30,737.36.

### III.  The Claims of Both EBF and Accord are Wholly Unsecured

The assignment of Medicaid reimbursements is governed by 42 U.S.C. § 1396a(a)(32). That section provides:

(a) Contents.

A State plan for medical assistance must–

\* \* \*

(32)  provide that no payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, under an assignment or power of attorney or otherwise; except that--

> (A) in the case of any care or service provided by a physician, dentist, or other individual practitioner, such payment may be made (i) to the employer of such physician, dentist, or other practitioner if such physician, dentist, or practitioner is required as a condition of his employment to turn over his fee for such care or service to his employer, or (ii) (where the care or service was provided in a hospital, clinic, or other facility) to the facility in which the care or service was provided if there is a contractual arrangement between such physician, dentist, or practitioner and such facility under which such facility submits the bill for such care or service;

> (B) nothing in this paragraph shall be construed (i) to prevent the making of such a payment in accordance with an assignment from the person or institution providing the care or service involved if such assignment is made to a

_____

[5]In _Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.,_ 336 F.3d 410 (5th Cir. 2003), the Fifth Circuit held that the label attached to a transaction turned on the substance of the relationship between the parties, rather than the label attached to the transaction.  However, the court expressly limited its holding to the facts in that case, because the decision was "guided by the policies behind [the Perishable Agricultural Commodities Act], which mandate protection of suppliers of fresh fruit and other perishable commodities."  336 F.3d, at 416.

governmental agency or entity or is established by or pursuant to the order of a court of competent jurisdiction, or (ii) to preclude an agent of such person or institution from receiving any such payment if (but only if) such agent does so pursuant to an agency agreement under which the compensation to be paid to the agent for his services for or in connection with the billing or collection of payments due such person or institution under the plan is unrelated (directly or indirectly) to the amount of such payments or the billings therefor, and is not dependent upon the actual collection of any such payment;

(C) in the case of services furnished (during a period that does not exceed 14 continuous days in the case of an informal reciprocal arrangement or 90 continuous days (or such longer period as the Secretary may provide) in the case of an arrangement involving per diem or other fee-for-time compensation) by, or incident to the services of, one physician to the patients of another physician who submits the claim for such services, payment shall be made to the physician submitting the claim (as if the services were furnished by, or incident to, the physician's services), but only if the claim identifies (in a manner specified by the Secretary) the physician who furnished the services; and

(D) in the case of payment for a childhood vaccine administered before October 1, 1994, to individuals entitled to medical assistance under the State plan, the State plan may make payment directly to the manufacturer of the vaccine under a voluntary replacement program agreed to by the State pursuant to which the manufacturer (i) supplies doses of the vaccine to providers administering the vaccine, (ii) periodically replaces the supply of the vaccine, and (iii) charges the State the manufacturer's price to the Centers for Disease Control and Prevention for the vaccine so administered (which price includes a reasonable amount to cover shipping and the handling of returns);

42 U.S.C. § 1396a(a)(32).

The exceptions in Section 1396a(a)(32) do not include factoring agreements. *See In re Missionary Baptist Foundation of America, Inc.*, 796 F.2d 752, 757 n. 6. (5th Cir. 1986) ("An examination of the legislative history of this provision reveals that its purpose was to prevent 'factoring' agencies from purchasing medicare and medicaid accounts receivable at a discount and then serving as the collection agency for the accounts.").

Section 1396a(a)(32) requires that the Texas Medicaid plan provide that funds Debtor receives from the Texas Department of Aging and Disability Services cannot be assigned to a third party such as EBF or Accord.  Consequently neither EBF nor Accord can be secured in Debtor's future receivables as a result of the factoring agreements in this case.  The claims are wholly unsecured.

Signed at Houston, Texas on November 27, 2017.


KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE